IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARKET AMERICA, INC.,

Plaintiff,

v.

GOOGLE, INC. and
LTECH CONSULTING, LLC,

Defendants.

C.A. No. 09-494-GMS

**MEMORANDUM**

## I. INTRODUCTION

On July 7, 2009, the plaintiff, Market America, Inc. ("Market America"), filed this diversity action against Google, Inc. ("Google") and LTech Consulting, LLC ("LTech") (collectively, "the defendants") for: fraudulent inducement (Count I), fraud (Count II), failure of essential purpose (Count III), and unfair and deceptive trade practices (Count IV). (D.I. 1.) On August 31, 2009, Google and LTech each filed motions to dismiss Market America's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim with respect to all counts. (D.I. 17; D.I. 19.) In response, Market America, "out of an abundance of caution," amended its complaint in accordance with Rule 15(a)(1)(A), on September 30, 2009, without seeking leave of the court or the defendants. (D.I. 22.) Market America's amended complaint retains Counts I, II, and IV, and further alleges rescission for failure of consideration in lieu of failure of essential purpose as its Count III claim. In its amended complaint, Market America seeks compensatory and punitive damages, as well as costs of suit, interest, and

attorney's fees for injuries suffered in connection with the defendants' alleged offenses. (D.I. 22 at 16.)

On October 19, 2009, Google filed a motion to dismiss Counts I, II, and III of Market America's amended complaint pursuant to Rule 12(b)(6). (D.I. 26.) LTech likewise submitted its own motion to dismiss those three counts on the same date (D.I. 28), and ultimately joined Google's reply brief (D.I. 32). Presently before the court, are the defendants' Rule 12(b)(6) motions to dismiss Counts I, II, and III of Market America's amended complaint. For the reasons that follow, the court will grant the defendants' motion.

## II. BACKGROUND

The following facts are taken from Market America's amended complaint. (D.I. 22.) Market America, a North Carolina corporation affiliated with international sites in Australia and Hong Kong, is an Internet marketing and product brokerage company that pioneered an online shopping portal similar to Amazon.com. (D.I. 22 at ¶ 6.) Market America's technology enables customers using the site to maintain an "online contact or guide" on the Internet, which allows for "One-to-One marketing," and aims to facilitate the creation of a "preeminent online shopping destination." (Id.) In November 2007, Market America and its affiliates sought to expand the scope of their offerings by allowing its site visitors to search for, identify, and purchase "not only Market America-branded products, but also the millions of products sold by [its] partner stores, referred to as 'premier partners' or 'affiliate partners.'" (Id. at ¶ 7.) Specifically, Market America created a "Universal Shopping Cart," wherein a buyer could complete purchases from a premier partner store on the Market America site, with Market America subsequently transferring payment to the appropriate partner. (Id.) In order to implement this plan, Market America contacted Google, in November 2007, to assess whether Google could assist it in

developing its "internal capability for . . . visitors to search the retail offerings available on its affiliate partner stores' sites." (Id. at ¶ 9.) Google Enterprise Sales Representative, Robert Evanikoff ("Evanikoff"), responded to Market America's inquiry and introduced it to the Google partner, LTech. (Id.) LTech Vice President of Business Development, Russ Young ("Young"), served as the company's contact with Market America.

Market America avers that it informed Google and LTech, in its initial discussions with both companies, that it needed a search system with the capacity to handle thirty million individual products upon implementation. (Id. at ¶ 11.) Market America also explained that it required a system that could handle 50 million products six months after implementation and "could grow to 90 million over time." (Id.) Market America alleges that Google and LTech responded to its request with assurances that their enterprise search products and appliances were well-equipped to meet such system specifications. (Id. at ¶ 12.) Specifically, Market America avers that Google represented that its "Google Search Appliances" ("GSA")—rack-mounted computer servers with loaded software—would retain the flexibility and advanced search capacity to meet Market America's needs. Further, Google maintained that it, in conjunction with LTech, would be capable of providing Market America a system with the capacity to implement its anticipated volumes of products, acceptable response times, and system flexibility. (Id. at ¶ 13.) Market America indicates that Evanikoff verbally communicated these assurances to Market America personnel in November 2007, as well as relayed such representations in his responses to a forty-five point questionnaire, where he asserted that Google could handle an increased number of products by combining multiple GSAs into clusters that would "function as a single unit even though they may contain multiple nodes." (Id.) Evanikoff also emailed

Market America a GSA "deployment guide" which represented that the GSA model GB8008 was "designed to handle document capacity needs up to . . . 30M." (Id.)

Additionally, Market America alleges that, during a visit to Market America headquarters on December 18, 2007, Google and LTech representatives stated that "they could install a GSA-based system that could handle 30 million products within three months and 60 million products in 6 months,[1] all with sub-second response times," and that the final system would have "wide flexibility," including spell-check and the ability to highlight certain sections of results. (D.I. 22 ¶ 14.) Market America also avers that the defendants agreed to make a public announcement regarding their partnership with Market America at the "Market America Leadership School," an event attended by over twenty thousand individuals, on February 6, 2007. (Id. at ¶¶ 16-18.)

Market America alleges that it entered into a Services Agreement with LTech on February 1, 2008, and a License Agreement with Google on February 4, 2008, because of these representations. (Id. at ¶ 20.) According to Market America, the defendants' representations continued after the parties executed the agreements. Specifically, Market America references the Statement of Work ("SOW"), which is appended to the Services Agreement and indicated that the GSA system would "leverage the speed and power of the [GSA] platform to deliver relevant search results in a variety of formats and zones to empower Market America users with up-to-date and on-target product information." (Id. at ¶ 21.) Market America also emphasizes that the SOW provided that "[t]he GSA will generally serve search responses in sub one-second time frame," and stipulated that all services, along with acceptance testing, would be completed by June 15, 2008. (Id.) After executing the agreements, Market America purchased a GSA for one million dollars, which was intended to handle fifteen million documents, with the option of

[1] The defendants dispute Market America's claim that they represented that a GSA-based search technology could search between thirty and ninety million products in under a second. (D.I. 27 at 3 n.3; D.I. 29.)

upgrading this capacity through the acquisition and installation of additional licenses and GSA machines. (Id.) On February 8, 2008, Market America, Google, and LTech announced their "new Google relationship and the upcoming search capabilities," to Market America's Independent Directors, customers, and Leadership School. (Id. at ¶ 23.) Google and LTech representatives attended the event and addressed the crowd of over twenty thousand people. (Id.) Based on the SOW's June 15, 2008 timeframe, Market America alleges that it "hired product merchandisers and other personnel, purchased additional software and hardware to support its anticipated increased capabilities, and continued to make public announcements to court premier partners to join its Universal Shopping Cart." (Id. at ¶ 25.)

As of April 2008, however, the GSA system showed search response times between eight and fifteen seconds—well above the sub-second timeframe that Market America requested, and that Google and LTech allegedly agreed to provide—and would crash at fifteen queries per second. (Id. at ¶ 26.) On June 25, 2008, Google representative and Head of Sales, Tom Mills ("Mills"), told Market America, "I can do nothing but apologize for the delays on your project—I am truly sorry for that and promise you we are doing our best to find an effective solution." On June 26, 2008, Mills indicated that it was necessary to "scale back a bit from the initial plan to ensure a reasonable level of performance." (Id. at ¶¶ 27-28.) Near the end of June 2008, LTech suggested that the parties try to implement a temporary system that was "more digestible," and Google determined that the current GSA system was not scalable to thirty, fifty, or ninety million products. (Id. at ¶ 29.) Google's representatives guaranteed Market America that it would devote resources to delivering a different long-term solution and "throughout the summer [and] on a daily basis, represented . . . that resources were being used to produce a final search system that would deliver what Google and LTech had promised." (Id. at ¶ 31.) In July, Google

proposed an interim system that could handle two million documents. (Id. at ¶ 32.) The interim system crashed, however, when it went "live" at Market America's International Convention on August 8, 2008. (Id. at ¶ 33-34.) This event was attended by a Google representative who again addressed the crowd "to ensure Market America's Independent Distributors, customers, vendors, and partners that an acceptable system would be implemented." (Id. at ¶ 33.)

With Market America's independent distributors and partners losing confidence in the GSA-based search system, and Google and LTech's continued failed attempts to provide a GSA system that was scalable to approximately ninety million products, Market America informed Google, on January 2, 2009, that it would not proceed with the implementation of the GSA-based enterprise search capacity. (Id. at ¶ 37-39.) As a result of Google and LTech's inability to produce a GSA system scalable to ninety million products, Market America alleges that it "has incurred and continues to incur significant costs in developing an alternative enterprise search capacity." (Id. at ¶ 41.)

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P 12(b)(6). In deciding a Rule 12(b)(6) motion, the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). A complaint does not need detailed factual allegations, but it must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957); Fed. R. Civ. P. 8(a)(2)). "To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, --- U.S. ---, ---, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). The assumption of truth does not apply, however, to legal conclusions couched as factual allegations, or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than a mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)) (internal quotations omitted).

## III. DISCUSSION

### A. The Fraudulent Inducement and Fraud Claims

Under Delaware law,[2] a plaintiff alleging fraud must demonstrate that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference for the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured as a result of this reliance. *ABRY Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. Feb. 14, 2006) (citing *DCV Holdings, Inc. v. ConAgra Holding, Inc.*,889 A.2d 954 (Del. 2005)). Likewise, a claim of fraudulent inducement requires the same five elements. In alleging these elements in either claim, a plaintiff must plead "most of [these] elements with particularity." *ABRY Partners*, 891 A.2d at 1050. Specifically, a plaintiff must, "in all averments of fraud or mistake," plead with particularity the "circumstances constituting

[2] The Service Agreement executed between Market America and LTech, as well as the License Agreement executed between Market America and Google, both include a choice of law provision dictating that the agreements shall be "governed and construed in accordance with the laws of the State of Delaware" without regard to conflict of law provisions. (D.I. 21 Ex. A at 4, Ex. C at 6.)

fraud or mistake." *Id.* This particularity requires the plaintiff to allege: (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representation." *Winner Acceptance Corp. v. Return on Capital Corp.*, C.A. No. 3088-VCP, 2008 Del. Ch. LEXIS 196, at *20-21 (Del. Ch. Dec. 23, 2008) (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003)). Moreover, the misrepresentation must concern a "past or contemporaneous fact or a future event that falsely implies an existing fact." *Winner Acceptance Corp.*, 2008 De. Ch. LEXIS 196, at *21. A fraud claim will not stand if the misrepresentation pled is simply "[a]n unfulfilled promise of future performance," unless "at the time the promise was made the speaker had no intention of performing." *Id.*

Such pleading particularity is not required, however, in alleging "malice, intent, knowledge and other condition[s] of the mind," which may be averred "generally." *ABRY Partners*, 891 A.2d at 1050. Despite the lower particularity threshold required to plead the knowledge element of a fraud claim, however, a plaintiff must still allege "sufficient facts from which it can be reasonably inferred that this 'something' was knowable and that the defendants were in a position to know it." *Am. Int'l Group, Inc. v. Greenberg*, C.A. No. 769-VCS, 2009 Del. Ch. LEXIS 15, at *99-100 (Del. Ch. Feb. 10, 2009) (quoting *IOTEX Communications, Inc. v. Defries*, Civ. A. No. 15817, 1998 Del. Ch. LEXIS 236, at *13 (Del. Ch. Dec. 21, 1998)). Consequently, even where it is clear that the "requisite factual information is peculiarly within the defendants' knowledge or control," the plaintiff cannot simply allege "boilerplate and conclusory allegations," except where the complaint simultaneously "delineate[s] at least the nature and scope of [the plaintiff's] effort to obtain, before filing the complaint, the information needed to plead with particularity." *United States v. Payment Processing Ctr., LLC*, Civ. A. No.

06-0725, 2006 U.S. Dist. LEXIS 75715, at *19 (E.D. Pa. Oct. 18, 2006).

Here, Market America contends that the defendants engaged in fraud and fraudulently induced it into entering the Service and License Agreements with LTech and Google, respectively. In support of its claims, Market America alleges with respect to both counts that the defendants: (1) knew their representations about the capacity of the GSAs and GSA-based search system were "false when they were made or the representations were made with a reckless indifference to their truth or falsity" (D.I. 22 at ¶¶ 44, 52); (2) made misrepresentations that were "willful and material" (id. at ¶¶ 45, 53); and (3) proffered their statements with respect to the GSA capacity "with the intent that Market America would rely on the representations when deciding to enter into contractual agreements with the [d]efendants" (id. at ¶¶ 46, 54). Market America further alleges in its answering brief in opposition to the defendants' motion to dismiss, that the defendants' knowledge of the falsity of their statements can be inferred from the fact that "[t]he [d]efendants made specific and contemporaneous representations about the capabilities of *their own* technology, and those statements were flatly incorrect at the time made." (D.I. 30 at 2.) Market America argues that the defendants' incorrect statements—made with "vastly superior knowledge about the capacities of [their] technology"—coupled with their ultimate inability to produce the systems desired, combine to produce a "plausible" claim satisfying Rule 8 of the Federal Rules of Civil Procedure's pleading requirements. (Id. at 9.)

Conversely, the defendants argue that Market America has failed to plead any factual allegations that relate directly to the scienter element. In lieu of factual allegations, the defendants assert that Market America relies on conclusory statements in an attempt to plead the required "knowing and reckless" element. (D.I. 31 at 4.) Specifically, the defendants cite

paragraphs forty-four and fifty-four of the amended complaint[3] as illustrative of the conclusory nature of Market America's allegations. (D.I. 22 at ¶¶ 44, 54.) These allegations, the defendants contend, fail to meet the pleading requirements articulated by the Supreme Court in *Bell Atlantic Corporation v. Twombly* and, therefore, are insufficient and should be dismissed. Moreover, the defendants assert that the allegations Market America presents in its answering brief to support the contention that the defendants knew their statements were false are not included in its amended complaint and cannot be considered in assessing whether Counts I and II are adequately pled.

In view of Delaware law and in consideration of the plaintiff's amended complaint, it is clear to the court that Market America's allegations are insufficient to sustain its fraudulent inducement and fraud claims. Specifically, in lieu of providing factual allegations to support its claims that the defendants acted with knowledge or with reckless disregard as to the truth or falsity of its statements, Market America instead provides mere recitations of the legal elements of the claims. While Market America attempts to buttress these claims in its answering brief by arguing that the defendants either knew or should have known that their statements about the capacity of the GSA's were false because they were characterizing their own technology, the defendants are correct that such assertions cannot be considered by this court in deciding the motion to dismiss, because they were not included in Market America's amended complaint. *See Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) (noting that a court considering a motion to dismiss must rely on the allegations included in the complaint).

Consequently, the court must rely solely on the allegations of the amended complaint,

---

[3] In paragraph forty-four of its amended complaint, Market America alleges that the "[d]efendants knew these representations to be false when they were made or the representations were made with a reckless indifference to their truth or falsity." (D.I. 22 at ¶ 44.) Moreover, in paragraph fifty-four of its amended complaint, Market America states that the defendants "proffered these statements with the intent that Market America would rely on the representations when deciding to enter into and continue its relationship with [d]efendants." (Id. at ¶ 54.)

which assert that the defendants: (1) were aware that Market America needed a search system that could initially handle thirty million individual projects, and ultimately ninety million individual products in a short period of time (D.I. 22 at 3-4); (2) represented they could implement a GSA-based system that would meet all of Market America's enterprise search needs with respect to anticipated volumes of products, acceptable response times, and system flexibility (id. at 4); (3) repeatedly reassured Market America via in-person communications, facsimile, and email correspondence—even when admitting that the system initially contemplated could not be delivered—that a solution would be found and a workable system implemented (id. at 8-11); (4) failed, per the stipulations of the Services Agreement SOW, to provide a GSA that would "generally serve search responses in sub-one second time frame" (id. at ¶ 22); and (5) "knew these representations to be false when they were made or the representations were made with a reckless indifference to their truth or falsity" (id. at ¶¶ 44, 52). Aside from Market America's last blanket assertion, however, none of its allegations lead this court to reasonably infer that the defendants were in fact aware that the statements they were making to Market America were false, or that they were recklessly indifferent as to their falsity.

Rather, even viewing the facts alleged in a light most favorable to the plaintiffs, as the court is required to do at this stage, Market America's amended complaint does not support its fraud and fraudulent inducement counts. While Market America details that Google and LTech's representations prior to execution of the agreements were ultimately incorrect with respect to the GSAs' scalability and document capacity,[4] the amended complaint does not allege facts from which the court can infer that the defendants knew their representations were wrong, other than

[4] Market America notes that in November of 2007, Evanikoff filled out a forty-five point questionnaire in which he indicated that the GSA could be combined into clusters that could "function as a single unit" to maximize capacity, and that two of "Google's top engineers" were aware of Evanikoff's communications. (D.I. 22 at ¶ 13.) Moreover, in December of 2007, Evanikoff also sent Market America an email with a GSA deployment guide which claimed that the GSA system was "designed to handle document capacity needs up to . . . 30M." (Id.)

to state in conclusory fashion that the defendants did indeed know and made their assertions willfully. (Id. at ¶¶ 44-45.)

Instead, the amended complaint depicts the defendants as involving their "top engineers" in the Market America project, attempting to adapt its system implementation to increase product capacity, and joining Market America executives at events announcing the Google-LTech-Market America partnership. (Id. at 3-11.) The amended complaint further describes the defendants as representing their ability to expand Market America's document capacity at Market America events, dedicating resources to finding a long-term solution while communicating with Market America "on a daily basis," and ultimately working for eleven months in an attempt to find a solution. (Id.) In view of these facts, the court disagrees with Market America's assertion that its amended complaint plausibly supports the knowing or reckless indifference element of its fraud claims, despite the lower particularity threshold required for this element. Consequently, the court will grant the defendants' motions to dismiss Counts I and II for failure to state a claim.

**B. The Rescission for Failure of Consideration Claim**

Under Delaware law, a contract may be rescinded where there is an "outright refusal of one party to a contract to perform the contract or its essentials," such that the offending party's failure to "perform [its] basic terms" is considered "unjustified." *Sheehan v. Hepburn*, 138 A.2d 810, 812 (Del. Ch. 1958). Moreover, Delaware law allows for rescission where there has been a "material breach" of a central provision of the agreement in question, failure to substantially perform a term of the agreement, undue influence, illegality, lack of capacity, or failure of consideration. *See id.; see also Liafail, Inc. v. Learning 2000, Inc.*, No. C.A. 01-599, 2002 WL 31667861, at *3 (D. Del. Nov. 25, 2002). Where such a material breach or failure to perform occurs, the court retains discretion to grant rescission so as to return the "parties . . . [to] the

positions they held prior" to entering the contract. *See Sheehan*, 138 A.2d at 812.

In evaluating whether a contractual provision has been breached or inadequately performed, a court interpreting a contract must ascertain the parties' intent "from the language of the contract" and where that "language is clear and unambiguous, [the] court [must] accord that language its ordinary meaning." *See Council of Dorset Condo. Apts. v. Gordon*, 801 A.2d 1, 7 (Del. 2002) (citing *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992)). Specifically, while a court deciding a motion to dismiss may look to extrinsic evidence to interpret the meaning of an ambiguous provision and ascertain the parties' intentions, it may not, if the provision is unambiguous, use such evidence "to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity." *See MCG Capital Corp. v. Maginn*, C.A. No. 4521-CC, 2010 Del. Ch. LEXIS 87, at *27-28 (Del. Ch. May 5, 2010).

In Count III of its amended complaint, Market America contends that the defendants' failure to perform its contractual duties warrants rescission for lack of consideration and renders it entitled to compensatory damages. (D.I. 22 at ¶ 61.) Specifically, Market America alleges that: (1) Google and LTech entered their respective agreements with it to provide a GSA system that would "perform queries on between 30 million and 90 million products in sub one-second time frames" (id. at ¶ 58); (2) it would not have entered into the agreements with the defendants "unless these requirements were fulfilled" (id.); (3) the defendants have been unable to fulfill these requirements (id. at ¶ 59); and (4) the defendants' inability to do so has rendered the agreements "failed in their essential purpose and . . . totally lacking in consideration" (id. at ¶ 60). Moreover, Market America states in its answering brief that by incorporating Counts I and II into Count III, it also alleges that the agreements should be subject to rescission because the terms of the Order Form—which is appended to the License Agreement and constitutes part of

the complete agreement between the parties—contractually bound the defendants to deliver a GSA system with the capacity to handle fifteen million documents and return searches in sub one-second time frames.[5] (D.I. 30 at 18.) Market America further argues that, "to the extent Google and LTech's obligations under the contract are ambiguous," the court should inform its understanding of those obligations through extrinsic evidence such as the contemporaneous statements of the defendants. (Id. at 18.)

Conversely, the defendants argue that they were not contractually bound to produce the specific deliverables identified by Market America in its amended complaint and, therefore, rescission is not warranted. (D.I. 31 at 17-19; D.I. 29 at 1-3.) More particularly, Google asserts that it is not bound to the thirty to ninety million document capacity number or to the sub-second search time Market America purports was guaranteed in the agreements. (D.I. 27 at 18.) Specifically, Google sites its License Agreement with Market America, which does not include any provisions wherein Google agrees that it would deliver a particular search time or product and document capacity, as support for its contention. (Id.; D.I. 31 at 9.) Google also cites the Market America Order Form—incorporated into the agreement by reference—to the same end, and indicates that Market America's reference to the SOW as support that Google guaranteed its performance is inaccurate because Google did not execute that agreement. (Id.) In view of these facts, Google argues that the court should dismiss Market America's rescission claim against it because it has not materially breached the License Agreement.

---

[5] Specifically, Market America notes that the License Agreement, Services Agreement, SOW, and Order Form (signed by LTech, but incorporated into the License Agreement with Google by the License Agreement's express terms), constitutes the whole of the agreement between the parties. (D.I. 30 at. 17.) To this end, Market America argues that the defendants were required to provide a system with the capacity to handle fifteen million documents and sub one-second response times, because: (1) the Order Form promises "one GSA model 8008 with the asserted capacity to handle 15 million documents" and the ability to "purchase additional GSA 8008 boxes each providing an additional 15 million documents to Market America's search capacity up to a purported 90 million documents" (id. at 17); and (2) the SOW indicates that the GSAs "purportedly return searches of its documents in sub one-second response times" (id. at 18).

Similarly, LTech, in addition to joining the arguments put forth in Google's reply brief, argues that Market America's rescission claim must fail because the Services Agreement explicitly states in a capitalized provision entitled "Limitation on Warranties and Cap on Liability," that:

> In the event of any breach of this warranty, LTech's sole responsibility, and client's sole remedy, is for LTech to promptly and diligently remedy any defects at no cost to the client . . . Other than as stated herein, LTech makes no representations, warranties, or guarantees, express or implied, with respect to the deliverables or services provided pursuant to this agreement, including implied warranties of merchantability or fitness for a particular purpose.

(D.I. 29 at 2-3.) Consequently, LTech maintains that because the agreement does not include a provision guaranteeing a particular document capacity capability and search response time, and notes in unambiguous terms that LTech makes no representations beyond the four corners of the agreement, it has not breached a material provision of the contract and the rescission claim cannot stand. (Id.)

Here, neither the License Agreement between Google and Market America, nor the Services Agreement between LTech and Market America includes contractual provisions guaranteeing a particular quantifiable performance. To the contrary, both agreements state in clear and explicit terms, that the executed agreements represent the whole of the parties' obligations and that any representations outside the agreement are not encompassed within the contractual terms for liability purposes. (D.I. 27 at Ex. A, Ex. B.) More specifically, Google's License Agreement, like LTech's Service Agreement, contains liability provisions stipulating that: Google does not warrant that the operation of the Software will be "error-free" or "uninterrupted" (D.I. 27, Ex. B at 4); "the product and services provided by Google and its Licensors are otherwise provided 'as is'" (id.); "Google does not warrant that the product or any

portion thereof, [is] error or bug free" (id.); and "Google and its Licensors assume no responsibility for the proper installation and use of the product" (id.).

Moreover, Market America's contention that the Order Form and SOW bound the defendants to deliver a system with a particular document capacity and search speed—even if the License and Services Agreements did not—is similarly unpersuasive, because the Order Form and SOW are both governed by the License and Service Agreements and, therefore, subject to their disclaimers and warranties.[6] Consequently, as the agreements do not contain provisions requiring either party to deliver a GSA system with a particular document capacity or search speed, do not guarantee that the GSA-system developed by Market America and the parties will prove successful in implementation, and disallows liability for representations not included in the agreements in explicit terms, Market America cannot successfully allege that the defendants have materially breached their respective agreements. In view of these considerations, the court will grant the defendants' motion to dismiss for failure to state a claim with respect to Count III.

## V. CONCLUSION

For the foregoing reasons the court will grant the defendants' motion to dismiss Counts I, II, and III of Market America's amended complaint.

Dated: August 9, 2010

CHIEF UNITED STATES DISTRICT JUDGE

[6] Specifically, the Google-Market America License Agreement states, "This Agreement and the corresponding purchase document by which You order certain Products ('Order Form') from LTech Consulting, LLC, a Google authorized reseller ('Reseller') set forth the terms and conditions under which You may license and use such products . . . The Order Form is subject to, and is governed by, this Agreement." (D.I. 27 at Exhibit B, 1.) Additionally, the LTech-Market America Services Agreement notes explicitly that the Agreement, which includes the SOW, "governs the services provided under this Agreement," and "represents the entire agreement between the parties as to the matters referenced herein and is not subject to change or modification except by written agreement signed by both parties." (Id. at Ex. A; D.I. 29 at 2.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARKET AMERICA, INC.,

Plaintiff,

v.

GOOGLE, INC. and
LTECH CONSULTING, LLC,

Defendants.

C.A. No. 09-494-GMS

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendants' motions to dismiss Counts I, II, and III of the plaintiff's amended complaint (D.I. 26; D.I. 28) are GRANTED.

Dated: August 9, 2010

CHIEF, UNITED STATES DISTRICT JUDGE